Your Honor, may it please the Court, I'm Fulop Trevino on behalf of Defendant Felipe Mendoza-Granades and the matter has been briefed obviously by both parties. I'm happy to answer any questions the Court may have but I have no further presentation and in fact I believe there's a motion pending before Your Honor. Right, there was a late, it came in late, very late Friday afternoon. I have to apologize, it was actually submitted Your Honor as soon as I acquired some supplemental information on Wednesday and I spent almost half an hour on the phone with various members of the Court's office trying to obtain a fax number for it and I did in fact, was given a fax number. I faxed a courtesy copy to the Court on Wednesday but I understand subsequent to that there was some snafu within the Court. I didn't get it until Friday afternoon. My apologies, I wish it had gotten to the Court earlier. But I have nothing further to add but I'd be happy to answer any questions from the Court. Judge Delson? No, no questions. Okay, thank you. Thank you very much, Your Honor. Mr. Coleman. Yes, good morning. Ben Coleman for Mr. Aguilar Ramirez. We've raised two sentencing issues. I'd like to start off with the vulnerable victim issue and then to the extent I have time I'll move over to the 3553 issue. With respect to the vulnerable victim issue, the District Court imposed a vulnerable victim adjustment for two reasons. One was that the victims in the case spoke Spanish and the other was that they knew they were undocumented aliens and therefore would not want to report the crime. Taking the first rationale, the speaking Spanish, I think one of the major problems in this case is that I believe the inference or the explanation, although it wasn't fully articulated, was that because they spoke Spanish they could not seek help or would have difficulty seeking help. I think the problem is, number one, there was no evidence introduced to establish that the mere fact that they spoke Spanish somehow would make it difficult for them to seek help. I think in Southern California a large percentage of the population speaks Spanish. Certainly a large percentage of law enforcement officials speak Spanish. They're recruited because of their Spanish-speaking abilities. Oftentimes they're required to speak Spanish. There's just no evidence in the record, I believe, to indicate that their Spanish-speaking ability would somehow diminish their ability to seek help. In fact, I think in the government's sentencing memorandum, they indicated that not all of the victims spoke Spanish. Some spoke English. There's, I think, just a problem based on the record of any indication that they had difficulty seeking help and certainly it was the government's burden to establish the adjustment and they introduced no evidence to support it with respect to that factor. In addition, in the Castellanos case, although it was in a different context, this Court rejected the notion that Spanish-speaking ability was somehow a characteristic that should subject a defendant or a victim's characteristic that should somehow subject a defendant to a vulnerable victim adjustment. Why isn't your real problem Sierra Valdez? Your Honor, I do believe that that is our biggest problem is Sierra Valdez. I guess I have a few comments about that. The first is that, frankly, I think it's a little bit difficult, not to be too critical, but it's a little bit difficult to discern the controlling legal principle. The entire explanation in that case was one paragraph long. It did not cite Castellanos. It did not cite Castaneda. It did not cite any authority whatsoever. So I think in this case there is somewhat of a conflict in the Court's precedent in that in Sierra Valdez there was no citation to these previous cases at all. In addition, I guess factually we are in a little bit of a dis- I don't see that Castellanos helps you, though. Well, I think Castellanos helps us in a couple of factors. The first is I think Castellanos helps us with respect to the District Court's second explanation as to why the Voluntary Victim Adjustment should apply, and that is because the victims knew that they were undocumented aliens and therefore would not want to seek help. In Castellanos, this Court cited approvingly the Fifth Circuit's decision in Box. Box is a very similar situation to what we have here. In Box, the victims had been arrested for indecent exposure or indecent behavior, I think in a park or something like that, and what the law enforcement officials were doing is they were extorting them and saying, if you pay us money, we'll make the charges go away, we'll drop the charges. And that, of course, is a situation where the victims would not want to reveal that they are in fact engaged in illegal conduct, and that is the reason why the District Court in that case imposed the Vulnerable Victim Adjustment. Of course, the Fifth Circuit reversed and said that's not the type of situation that should trigger a Vulnerable Victim Adjustment. So I do believe that Castellanos heavily relied upon Box, and cited Box approvingly, and in fact laid out the rationale of Box. So I do think that Castellanos does help us with respect to that one particular issue. Getting back to Sierra Velazquez, frankly, in that case, it was a situation where the defendants themselves were the smugglers, and this Court applied the adjustment. In this case, the defendants were not the smugglers. Right. We've got pirates stealing smugglers' poyos. Correct. And I think that that is a distinction. How does that help you? Well, I think it helps because in the situation, first of all, I just think that Sierra Velazquez, I mean, I understand it's the law of the circuit. I think that there's no reasoning in the decision, but I think it helps in the sense that when somebody is the actual smuggler, perhaps there is a relationship that is formed. There's a trust relationship that was formed. The victim is vulnerable in the sense that they are trusting themselves this particular individual, and then the smuggler himself is taking advantage of that particular victim. In this particular case, there was no type of relationship between the defendants and the victims. So they were just pawns. Yes. And so I think that that is a distinguishing factor that can take this case outside of Sierra Velazquez. And I just think, frankly, that the court should take a closer look, given the fact that there really were no cases cited in Sierra Velazquez. It was a one-paragraph explanation, maybe one or two sentences. Is it not a holding? Is it something that we're free to ignore? You think that it's unreasoned, but we said it. I understand. Is it a holding? Was it necessary to the case? Does it influence the result? If so, then this panel is bound by it. Can you give us an explanation as to why this panel is free to ignore it? Well, I guess there are two explanations. Explanation number one is it is a holding. I agree it's a holding, is that it's factually distinguishable. Explanation number two is that I believe it is inherently inconsistent with Castellanos, and Castellanos was decided before Sierra Velazquez. And I believe under this court's precedent, interpreting how you interpret precedent, this court should look to the first decision rather than the second decision. So I think that those would be the two reasons why this court is not bound by Sierra Velazquez. And so, frankly, I think obviously that's our biggest problem, but I don't think it ends the analysis. If there are no other questions on the vulnerable victim issue, I would just like to briefly touch on the 3553 issue. At the time – There's a question from Judge Nelson. Yes, Your Honor. Excuse me. You opened your argument by at least implying that the district court improperly relied on the fact that the defendant spoke Spanish. I think you were trying to bring yourself within Castellanos. But where in the record did the district court rely in sentencing on the fact that the defendant spoke Spanish? Not the defendant, but the victim spoke Spanish. I guess the district courts had a very brief explanation for the vulnerable victim adjustment, and it's at page 84 of the excerpts. And the district court simply found – and I've quoted at page 4 of the opening brief. The district court stated, I do find, as I have found in the other cases, that the vulnerable victim two-level enhancement is justified as these illegal alien victims cannot voluntarily go to the authorities after or during their ordeal, and they spoke no English. They knew they were here illegally, and I just reject the assumption of the risk argument. So I took her statement that they spoke no English to be reliant on the fact that they were Spanish speakers. But again, it's our position that there's no evidence in the record to establish that the fact that they did not speak English somehow made it more difficult for them to seek help. And in fact, in the government's brief, one of the arguments the government makes is that because they were Spanish speakers, they couldn't protect themselves from the defendants. And I find that argument very interesting because the defendants were Spanish speakers. In fact, Mr. Aguilar Ramirez is an undocumented alien from Mexico who spoke Spanish. So in fact, in this case, the victims were actually better suited to protecting themselves from the defendants than an English speaker because an English speaker couldn't communicate with the defendants. So I really think that the Spanish-speaking ability in this case was not sufficient to justify the vulnerable victim adjustment. Moving on to the 3553 issue, when the briefs were submitted, Rita had not been decided. I'm sure the court is well aware. Rita has now been decided, although this court still has not issued its decisions in Zavala and Carty yet, and I believe those decisions are still pending yet another Supreme Court case. So I understand that those decisions may not come down for a while. I do believe that under Rita, though, there should at least be a remand in this case, and we don't necessarily have to wait for Zavala and Carty. Rita made it clear that while an appellate court maybe can do some type of presumption and looking at reasonableness as far as relying on the guidelines, a district court cannot give the guidelines any presumptive effect. And in this case, I think they didn't exactly say that. That's what the call is all about. Well, I believe the interpretation of Rita is that a district court. That's one way you could interpret it. Well, then maybe if my interpretation is wrong, then maybe it may make sense to wait for, I don't remember what the, I think it's. Gall. Gall. Maybe it makes sense to wait for that. In this case, I think some of the comments that the district court made suggest that the district court did not fully understand its authority in imposing the sentence. The district court made comments such as it's not up to the court to legislate in the first instance and to decide what the appropriate sentence is in the first instance. The district court made a comment that it saw no reason to deviate from the guidelines. I think those things tend to suggest that the district court was looking at 3553 as setting up a regime where the guidelines are the most important or sort of where you start off and where you rely on. And if there's some other reason to take the case outside of the guidelines, then that's what a court does. And given the state of the record, given the, it's a 25-year sentence about that was imposed on Mr. Aguilar Ramirez. Given that there, I think there's at least some doubt there. I don't see the harm in remanding the case to the district court. And if the district court was not, if that was not what the district court was thinking, if the district court fully understood the 3553 analysis and was not putting too much weight on the guidelines, then all the district court has to do is say so and that will end the matter. But I don't see the harm in sending the case back for that inquiry. And if the district court was conducting an analysis where it was placing too much weight on the guidelines, perhaps the district court after Rita and then perhaps after Gall will have a different view of the matter. We're not talking about sending this case back for a full-blown trial. This is a fairly short sentencing proceeding. I don't see the harm really, given the fact that we're talking about a very lengthy sentence, of at least giving Mr. Aguilar Ramirez that shot to see if perhaps the district court would have a different take on the matter. And if there are no other questions, I guess I'll save the remaining time for rebuttal. Okay. Good morning, Your Honors. May it please the Court. Scott Kerenshaw on behalf of the United States. With respect to the Mendoza-Granados case that has been submitted on the record here today by defense counsel, I would do the same unless the Court has any questions regarding that case. Seeing none, I will turn to the Luis Aguilar Ramirez case, which the first issue addressed was the vulnerable victim enhancement. In this situation, as we've set forth, the standard review is clear error, and with respect to the application of the facts to the guidelines or the guidelines to the facts, it would be an abuse of discretion, not de novo, as defense counsel has refuted. The reason this is important is because we're not, in the first instance, looking as to what we would do. We're looking to determine whether the district court has erred or clearly erred. Here, the district court did not err in finding that these victims, rather, were particularly susceptible to the criminal conduct. Importantly, while the district court mentioned in particular two factors, there were several factors mentioned both by the probation office in the pre-sentence report as well as the government to support the fact that these victims were, in fact, particularly susceptible to criminal conduct. The fact that they were aliens who were reliant on the smugglers to enter the country, who wanted to enter the country illegally, obviously leading into the Sierra Velazquez case, which we believe is controlling in this case. There was the fact that they were unable to seek assistance due to the fact that they were illegal aliens. There was their inability to speak English, their presence in an unfamiliar culture. Importantly, there was the fact that these were aliens who were already being held in one place. They were essentially unable to leave until they had paid their smuggling fees. They were being held, if you will colloquially, as sitting ducks. Counsel, if we're relying on the question that they don't speak English, doesn't Castellanos govern that? No, Your Honor. The government does not believe Castellanos governs that. Castellanos did use the language, the court in Castellanos did use the language, the entire Spanish-speaking population, I believe it was referred to. But the issue in there was not the question of whether there was an ability to speak a particular language or an inability to speak English and whether that presented any type of limitations that made them vulnerable. The issue there was whether there was a potential cultural susceptibility on behalf of an entire culture, the Hispanic culture, that made them more likely to fall prey to a fraud scheme, such as the one that was presented in that case. Here, by contrast, it's very different. It's an actual limitation, a barrier in these victims' ability to communicate. For that reason, we believe that the Castellanos case is distinguishable. The only issue in that case was, is there not only the issue in that case, was the question of whether there's a potential cultural susceptibility, and that's what the court rejected, not the idea that the inability to speak English in a predominantly English-speaking society in any way could ever result in vulnerability. For that reason, we believe it makes sense that the Sierra Velazquez case did not cite Castellanos because it didn't directly address those issues. Here, Sierra Velazquez is controlling because it's not factually distinguishable on any principled basis. What we're talking about in that case was victims who were in the exact same position as the victims here. And what the court did, we disagree that the court did not provide any reasoning. The court said that victims such as those who were trying to enter the country illegally and were reliant on their smugglers find themselves in a more vulnerable position than other undescribed, but other victims. In this case, the only differences, as the court has described, they were pirates stealing the smugglers' poyos, if you will. Until the escalation in the two cases, Sierra Velazquez and the present case, the escalation in Sierra Velazquez was done by the smugglers themselves when they turned it into a hostage situation. And the escalation in this case was obviously the armed physical hostage taking itself. Until that occurred, these poyos, these victims, were in the exact same position with no differences at all. And that is what the court found to be vulnerable. And as the court has indicated, that is a holding. That is, this court has approved the applicability of the enhancement in that situation. And the only factual difference, if you will, is a distinction without a difference. Is a difference without a distinction, rather. I gather that the district court adopted the factual statements made in the PSR. On this particular issue, the court said that it would apply the enhancement, and then it mentioned the two factors in particular. No, but usually at the beginning of a sentencing, the district court says if you had a chance to read the report and recommendation, are there any objections? The court adopts the factual findings and statements made in the PSR. Did the district court do that? I believe that's the case, Your Honor. I'd have to check. I don't know. Because the PSR does amplify a bit on this vulnerable victim enhancement. It does. More so than what the district court said. It does quite a bit, Your Honor. And obviously when the district court did it, it was doing it in the context of the hearing and addressed the issue rather quickly. It addressed the issue rather quickly because it was not disputed. The defendant at that point appeared to concede that there was a vulnerability there and argued only that there was an assumption of risk that made that vulnerability otherwise inapplicable. The only instance in which the characteristics that the PSR, the government's brief, or for that matter the court indicated that made these victims vulnerable, the only challenge to those has been an appellate creation entirely, Your Honor. Which, again, leading back to the standard review in this case, we're unable to say that the district court erred in not finding that these were not vulnerable victims when there was no argument before the court whatsoever that these were not vulnerable victims. Okay. To address quickly the, I'm sorry, the Castaneda case, which was cited by defense counsel, the argument there was that the foreign status of the victims was inherent in the statutory defense and, therefore, should not, could not be taken into account. The, excuse me, in this case, as indicated in the Seer of Alaska's decision, Section 1203 hostage taking is obviously much broader than simply hostage taking of these particular foreign nationals. It is not in any way inherent in that offense to include not only the two characteristics that the district court mentioned, but the multitude of the several characteristics that were referred to in the PSR as well as the probation office. In addition, the district court did not apply the vulnerable victim enhancement because of the foreign status of the victim. Now, it's true that that is directly related in some ways to some of the characteristics, for example, the inability to speak English or other factors, but it was not the basis for the court's decision. What's important here is that defense counsel on appeal has attempted to isolate and separate two of these conditions and say individually, either due to Castellanos or other factors, that those factors don't apply. But here it was a situation that under the totality of the circumstances, who these victims were made them, I believe the court said it best a moment ago, they were just pawns in this. They were essentially sitting there and they had nowhere to go. They could not flee when the defendant and his co-conspirators came in. And they were sitting there as vulnerable as could be. In that case, we would submit on the vulnerable victim issue. We believe that the district court did not err in finding, let alone clearly err or abuse its discretion. With respect to, I'm sorry, let me backtrack a moment. Before we leave that, there's an attempt to shift the focus a bit to the question of whether these victims were, I'm sorry, this defendant was more criminally depraved in terms of applying the vulnerable victim enhancement. The government doesn't believe that's the proper analysis. While it's certainly true that committing these types of crimes against a vulnerable victim is more criminally depraved, that's not the focus. The focus is, as the language states, whether these victims were particularly susceptible to the criminal conduct. That said, in this situation, the conduct was more criminally depraved. It simply is more criminally depraved to kidnap people who are essentially confined to one place and can't leave. It is more criminally depraved to kidnap victims who do not speak the language and are unable to go to the authorities, even if there were no language barriers, because if they do, they are going to be arrested, deported, and perhaps imprisoned before deported, rather. It is more criminally depraved to take advantage of individuals in this situation. Now, the question has been raised about the language barrier, that maybe it wouldn't really have presented a barrier to reporting these crimes. As the PSR indicated, it wasn't that the inability to speak Spanish completely prevented these victims from going to the police, only that it was a language barrier. A language barrier is exactly that, a barrier to communication. The question of whether who these victims would have gone to to report the crimes or whether those people may have spoken Spanish, that is entirely speculation. It is beyond the record. The fact remains that there was a language barrier, and it may have made it more difficult, which was the language used in the PSR. That, in combination with all of these other factors, the government makes it clear that the district court did not err in finding that under the totality of the circumstances, who these victims were, that there was a vulnerability. With respect to the 3553 analysis, or what defenders term, claim that the district court silently applied an impermissible sentencing presumption in this case, the government does not argue that the court could in any way, regardless of whether that was the holding of Rito or, for that matter, Zavala, that the court could have applied a sentencing presumption. The government concedes that it could not have. The bottom line here is that the court did not do that. The district court, in comparing the district court's statements with those of the district court in Zavala, and I understand that court has been vacated and is on remand, but it does provide a useful example of a district court that is doing what defense counsel claims here, which is applying an impermissible sentencing presumption. In that case, the court said that it was applying a presumption. The court repeatedly stated that the vast majority of sentences will find themselves in the sentencing guidelines. The court did exactly as defense counsel stated here, which is it indicated that the track that it was on was to apply a guideline sentence, and it was up to the burden was on the defendant to essentially to knock the court off of that analysis. Here, the district court did it very differently. The district court repeatedly stated that it was an advisory sentence, advisory guidelines, rather. The court repeatedly went through the factors and specifically explained each of the factors that it found to be applicable from Section 3553A. The court indicated that it was now free and that it will and that it has considered the other factors and that the guideline sentence is not determinative. Also, the court did use the term deviate, but that is just as consistent with what the court actually did and the court is permitted to do, which is to, and is in fact required to do, which is to first calculate the applicable guideline range and use that as a starting point. The fact that the court indicated that it would not deviate from that in no way suggests that it used it as a presumption when, in fact, it is, it simply did what it is supposed to do. In this case, it's important that this is the third defendant who was sentenced in these cases. The first two defendants are the other two cases that were consolidated for appeal. And in each of those situations, the court imposed a sentence below the guideline. It's clear that the court knew that it was free to impose a below-guideline sentence and it repeatedly said, after consideration of all the factors, explaining many of those factors along the way, it found that a within-guideline sentence, albeit at the low end, was necessary and not greater, I'm sorry, sufficient and not greater than necessary to address the statutory sentencing factors. Unless the court has any further questions, I would yield the remaining time. Thank you. Thank you. Get some rebuttal. Hopefully briefly, Your Honor. With respect to the standard of review, I know there's been some recent cases where this is supposed to be abuse of discretion or de novo. I don't think the clear errors standard has ever raised its head. I think the tension in the court's cases right now is between abuse of discretion and de novo. We would certainly ask the court to apply the de novo standard. That's consistent with the case law before Booker, and we don't think Booker has changed that. So we think that the de novo standard should govern. There was also suggestion that perhaps the arguments that were made here were not adequately preserved below. There was an objection made to the vulnerable victim adjustment. The arguments may have been amplified a little bit, but I think the objection was certainly sufficient to preserve the issues. Judge Pires, you had asked whether the district court had made a statement on the record to the effect of, I adopt the pre-sentence report. I quickly scanned through the sentencing transcript again while opposing counsel was arguing. I did not see such a statement where she adopted the pre-sentence report. There were no objections to the pre-sentence report, were there, with respect to the factual statement? There wasn't factual objections. It was just an objection to the application of the adjustment. But in any event, the other factors that are listed in the pre-sentence report, I don't believe would aid the district court in any event. The other factors. Well, they sound more like, if you add them all up, they sound more like Sierra Velazquez or Velazquez here, whatever it is. Well, I'm not sure the other factors make it any closer to Sierra Velazquez. Obviously, it's our position that the distinguishing factor is that's a situation where the defendants were the smugglers, and the aliens at that point were actually, I guess, in the process of being, I guess, taken across the border, whereas here we have aliens who are already here in the United States. Well, the probation report gave, in paragraph 46. Right. It lists five facts. Yes. And one of them was the aliens were under the control of the defendants after being removed to a different location. The aliens were dependent on the defendants for their release to their relatives and their friends. The aliens were in an unfamiliar foreign culture. Right. Well, taking C and D off. It sounds like, well, probation officer didn't cite Sierra Velazquez. It sounds like that's what's going on here. Well, admittedly, the probation officer actually did cite Sierra Velazquez. The paragraph before the probation report. Oh, yes, they did. Yes, I'm sorry. But I still think these factors see the aliens were under the control of defendants after being removed to a different location. Well, that's the case in any kidnapping. In any kidnapping case, the victims are under the control of the defendants, and a large number of kidnapping cases are moved from location to location. The aliens were dependent on the defendants for their release. Well, in any kidnapping case, the victims are dependent upon the defendants for their release. I don't see how those make these victims any more vulnerable. The last one, the aliens were in an unfamiliar foreign culture. Once again, there's no evidence in the record to establish that these particular victims were unfamiliar with the culture. We don't know whether these were aggravated felons who had previously been in the United States and had been deported and are coming back. I gather this smuggling operation was – I didn't – right now I can go back and look carefully at the underlying facts. But I gather it was a typical smuggling operation. These people agreed – they agreed to pay their smugglers a fee to bring them into the United States. And I guess here it was the relatives are going to pay the fee. Correct. Is that right? Yes. But there – So they essentially submit themselves, you know, to the control and authority of their smuggler – of the smugglers. Yes, but – Is that right? There are some – in the government's – I believe it was in their sentencing memo, which is in the government's excerpts of record. They noted that some of the victims – the victims who were the people that were being smuggled actually then turned and became the kidnappers. That some of the – they decided – some of the victims who were the ones that were brought over decided, hey, this is a good business that these guys are in. And they actually joined forces with the people who were doing the kidnapping. So, I mean, I think the sense that these are individuals that are throwing themselves at the mercy of these kidnappers – I mean, there's just – the evidence actually in the records does not support that and to some extent supports the contrary, that these are people who have come in, have decided to break the law. They're not throwing themselves at the mercy. Some of them decided to become kidnappers after coming into the United States. So I don't necessarily – My understanding is that they're now victims of an entirely new crime. The first one they've submitted themselves to, that is, they're cooperating with the coyotes to come into the United States and understand that they're violating some U.S. laws. What they didn't bargain for was that the pirates would then intercept the smugglers and steal their booty. Well, and it's the same thing as the Box case. In that case, the victims, they consented to or agreed to commit indecent behavior in public. And then they did not consent to being extorted afterwards by police officers who said, we'll drop the charges if you pay us some money. And the police officers, according to the district court in that case, supposedly chose those victims because they knew that they were wealthy and that they wouldn't want to – they were white-collar type people who wouldn't want to be exposed. And it's the same thing here. I mean, they've engaged in this criminal conduct, and the fact that they didn't consent to them being kidnapped and the fact that they wouldn't want to report the crime because they are here illegally doesn't take it outside the Box scenario at all. And the government has ignored Box. Sierra Velasquez did not cite Box. Castellanos heavily relied on Box. So I just think that there's a tension there. Finally, just on the 3553 factors, the government, I guess they've conceded that the proposition that I was saying Rita stood for, the government has conceded, that the district court cannot presumptively rely on the guidelines. And what the government says is, well, the district court repeatedly stated that it knew that the guidelines were advisory. Well, yes, the district court knew that the guidelines were advisory, but the issue is, did the district court think that they were advisory but they were entitled to some type of special weight? And what it appears, based on the district court's language, is that the district court did believe that they were entitled to special weight. How can you say that, Counsel, when your client got a sentence well under the guidelines? He didn't. My client got the low end of the guidelines, 210 months. And then he got an 84-month 924C enhancement for a total of 294. So he did not get a sentence underneath the guidelines. And the fact that he got the low end of the guidelines demonstrates that perhaps if the district court correctly understood that the guidelines were not a presumptive type sentence, that perhaps the district court may have gone lower. And so the government had relied on the below-guideline sentences of the other defendants, but I don't think that should. What should the district court have said here? Well, other than deciding that 210, the low end of the guidelines, is a reasonable sentence here, after stating that she understood that the guidelines were advisory, what should the district court have said here or done in order to demonstrate to us that she really was existentially independent of those guidelines? Well, I guess there are two issues. One is what should the district court have said, and the other one is what should the district court have done. With respect to what the district court should have said, I am not in any way advocating that there is some magical phrase or phraseology that the district court has to articulate in order for it to be permissible. What I think the problem here is that what the district court did say tended to suggest that it believed that the guidelines were a presumptive sentence. I'm not saying that the district court has to say, I don't think — But, counsel, you're now — you're going to now stand the whole thing on its head. That is, any district court that now issues a sentence within the guidelines will have presumptively found itself not existentially free and, therefore, is subject to reversal. The only district courts that aren't subject to reversal are those that will be — that will be sentencing outside of the guidelines. No. I disagree with that. Had the district court not said things like — had the district court not said things like, I see no reason to deviate from the guidelines, it is — this court is not free to sit and legislate and decide on the first instance what the sentence should be. I think when the court makes those types of statements, it is suggesting that it believes that the guidelines dictate what it needs to do in the first instance. And I'm not saying that it — that I'm not trying to turn anything on its head. I'm just saying that given the language used in this case, I think it should be sent back for clarification. Okay. You're over your time. Thank you. Thank you, counsel. I appreciate your arguments very much. The matter will be submitted, and that adjourns our — completes our session for the day. The remaining two cases on calendar, which were Mueller v. County of Los Angeles and Richards v. City of Los Angeles, are submitted on the briefs. Thank you very much.
judges: T. G. Nelson, Paez, Bybee